**AFFIDAVIT OF SPECIAL AGENT PETER MILLIGAN
IN SUPPORT OF AN APPLICATION FOR COMPLAINT CHARGING
COSTA, GAMA, HENRIQUE, MELO, DASILVA, COSTA AND GONCALVES**

I, Peter Milligan, state:

## INTRODUCTION

1.     I have been a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and

Explosives ("ATF") since 2009.  I am an "investigative or law enforcement officer of the United

States" within the meaning of Title 18, United States Code, Section 2510(7).  I am currently

assigned to the Boston Group VI Field Office.  As an ATF Special Agent, my duties include the

investigation of violations of laws related to firearms trafficking, firearm possession by

prohibited persons, and the use of firearms in drug trafficking crimes.  I am a graduate of the

ATF National Academy and of the Federal Law Enforcement Training Center.

2.     This affidavit is based on an ongoing, multi-agency investigation into the criminal

activities of a criminal organization known as "Primeiro Comando da Massachusetts" or "PCM."

The agencies involved in the investigation include: the ATF; the Department of Homeland

Security, Homeland Security Investigations; the Massachusetts State Police; the Malden Police

Department; the Chelsea Police Department; the Somerville Police Department; the Middlesex

Sheriff's Office; the Lowell Police Department; the Weymouth Police Department; and the

Marlborough Police Department.

3.     This affidavit is being submitted in support of a criminal complaint for members

and/or associates of PCM for various federal crimes, including RICO conspiracy in violation of

18 U.S.C. § 1962(d); conspiracy to commit robbery and robbery in violation of the Hobbs Act,

18 U.S.C. § 1951; conspiracy to distribute controlled substances in violation of 21 U.S.C. § 846;

engaging in the business of dealing in firearms without a license in violation of 18 U.S.C. §

922(a)(1)(A); and alien in possession of a firearm in violation of 18 U.S.C. § 922(g)(5).  The

defendants for whom there is probable cause to believe that they have committed the above

crimes are: Marcio Costa, a/k/a "Marcino" and "Marcinn" ("COSTA"); Joao Pedro Marques

Guimares Gama, a/k/a  "Bahianinho" ("GAMA"); Breno Henrique DaSilva ("HENRIQUE");

Alvaro Dos Santos Melo ("MELO"); Edson DaSilva ("DASILVA"); Igor Costa ("I. COSTA");

and Vinicius Goncalves de Assis ("GONCALVES").

4.     Based on the investigation as set forth below, COSTA has been identified as a

leader in PCM.  COSTA is 28 years old and is presently residing in Malden, MA – based on the

investigation, prior to residing in Malden, COSTA resided in Somerville, MA, but stopped

staying in Somerville after a gang-related shooting took place at his Somerville residence.  Based

upon a review of records maintained by the Department of Homeland Security, COSTA was a

Brazilian national, and became a naturalized citizen of the United States on or about February

28, 2019.  There is probable cause to believe that COSTA has committed the following federal

crimes: (1) RICO conspiracy in violation of 18 U.S.C. § 1962(d); (2) conspiracy to commit

robbery in violation of the Hobbs Act, 18 U.S.C. § 1951; (3) conspiracy to distribute controlled

substances in violation of 21 U.S.C. § 846; and (4) engaging in the business of dealing in

firearms without a license in violation of 18 U.S.C. § 922(a)(1)(A).

5.     Based on the ongoing investigation as set forth below, GAMA has been identified

as being a member/associate in PCM.  GAMA is 21 years old and is presently residing in

Malden, MA – like COSTA, prior to residing in Malden, GAMA had resided in Somerville, MA,

but stopped staying in Somerville after a gang-related shooting took place at his Somerville

residence.  Based upon a review of records maintained by the Department of Homeland Security,

GAMA is a Brazilian national, and illegally present in the United States. There is probable cause to believe that GAMA has committed the following federal crimes: (1) RICO conspiracy in violation of 18 U.S.C. § 1962(d); (2) conspiracy to commit robbery in violation of the Hobbs Act, 18 U.S.C. § 1951; (3) conspiracy to distribute controlled substances in violation of 21 U.S.C. § 846; (4) engaging in the business of dealing in firearms without a license in violation of 18 U.S.C. § 922(a)(1)(A); and (5) alien in possession of a firearm in violation of 18 U.S.C. § 922(g)(5).

6.    Based on the ongoing investigation as set forth below, HENRIQUE has been identified as being a member/associate in PCM. HENRIQUE is 20 years old and is presently residing in Somerville, MA. Based upon a review of records maintained by the Department of Homeland Security, HENRIQUE is a Brazilian national, and illegally present in the United States. There is probable cause to believe that HENRIQUE has committed the following federal crimes: (1) RICO conspiracy in violation of 18 U.S.C. § 1962(d); (2) conspiracy to commit robbery in violation of the Hobbs Act, 18 U.S.C. § 1951; and (3) conspiracy to distribute controlled substances in violation of 21 U.S.C. § 846.

7.    Based on the ongoing investigation as set forth below, MELO has been identified as being a member/associate in PCM. MELO is 22 years old and is presently residing in Everett, MA. Based upon a review of records maintained by the Department of Homeland Security, MELO is a Brazilian national, and illegally present in the United States. There is probable cause to believe that MELO has committed the following federal crimes: (1) RICO conspiracy in violation of 18 U.S.C. § 1962(d); (2) conspiracy to commit robbery in violation of the Hobbs Act, 18 U.S.C. § 1951; and (3) conspiracy to distribute controlled substances in violation of 21

3

U.S.C. § 846.

8.      Based on the ongoing investigation as set forth below, DASILVA has been identified as being a member/associate in PCM.  DASILVA is 19 years old and was previously a resident of Whitman, MA.  DASILVA is presently in state custody facing kidnapping and firearms charges due to the PCM-related armed kidnapping described below.  Based upon a review of records maintained by the Department of Homeland Security, DASILVA is a Brazilian national, who is presently a legal permanent resident in the United States.  There is probable cause to believe that DASILVA has committed the following federal crimes: (1) RICO conspiracy in violation of 18 U.S.C. § 1962(d), and (2) Hobbs Act robbery in violation of 18 U.S.C. § 1951.

9.      Based on the ongoing investigation as set forth below, I. COSTA has been identified as being a member/associate in PCM.  I. COSTA is 20 years old and was previously a resident of Framingham, MA.  I. COSTA, who is a U.S. citizen, is presently in state custody facing charges arising out of his illegal activities on behalf of PCM.  There is probable cause to believe that I. COSTA has committed the following federal crimes: (1) RICO conspiracy in violation of 18 U.S.C. § 1962(d), and (2) Hobbs Act robbery in violation of 18 U.S.C. § 1951.

10.      Based on the ongoing investigation as set forth below, GONCALVES has been identified as being a member/associate in PCM.  GONCALVES is 21 years old and was previously a resident of Revere, MA.  GONCALVES is presently in state custody facing charges arising out of his illegal activities on behalf of PCM.  Based upon a review of records maintained by the Department of Homeland Security, GONCALVES is a Brazilian national, who is presently a legal permanent resident in the United States.  There is probable cause to believe that

4

GONCALVES has committed the crime of RICO conspiracy in violation of 18 U.S.C. § 1962(d).

11.     The facts in this affidavit come from my review of records and/or reports, my training and experience, and information obtained from other agents, officers and witnesses. This affidavit is only intended to establish that there is probable cause for the requested complaint and does not set forth all of the facts in regard to this ongoing investigation.

## PROBABLE CAUSE

### The PCM Gang

12.     Federal and local investigators have been involved in the investigation of PCM for approximately seven months. The PCM investigation arose out of an investigation of illegal firearms trafficking in communities North of Boston. The initial stages of the investigation involved the use of two Cooperating Witnesses (hereinafter referred to as CW-1"[1] and "CW-2"[2]) to make controlled buys of illegal firearms from individuals. These gun buys led to the identification of PCM because its members/associates were actively involved in illegally selling firearms in communities such as Somerville and Malden. As of the present date, investigators

---

[1] CW-1 has requested that his/her identity not be revealed for fear of reprisal or harm to his/her physical safety. I am aware of CW-1's identity and have met with CW-1 personally. CW-1 has provided accurate, truthful, and reliable information to law enforcement, including the ATF and Homeland Security Investigations ("HSI") in the past and continues to do so to the present. CW-1 has a minor criminal history and no convictions. CW-1 has received money from the government and has been promised protection against retaliation, including possible relocation, upon disclosure of CW-1's cooperation with law enforcement. CW-1 is also seeking immigration assistance to remain in the United States.

[2] CW-2 has requested that his/her identity not be revealed for fear of reprisal or harm to his/her physical safety. I am aware of CW-2's identity and have met with CW-2 personally. CW-2 has provided accurate, truthful, and reliable information to law enforcement, including the ATF and HSI, in the past and continues to do so to the present. CW-2 has no criminal history. CW-2 has received money from the government and has been promised protection against retaliation, including possible relocation, upon disclosure of CW-2's cooperation with law enforcement. CW-2 is also seeking immigration assistance to remain in the United States.

have seized 31 firearms, including 27 handguns, two sawed-off shotguns, one shotgun, one rifle, and several hundred rounds of various types of ammunition pursuant to the investigation. The investigation further uncovered that PCM members/associates not only illegally sell firearms, but also engage in various types of violent crimes (including robberies, kidnappings, and assaults) as well as drug trafficking. As of the present date, investigators have identified PCM members/associates committing crimes in the following Massachusetts communities: Malden, Revere, Everett, Somerville, Boston, Marlborough, Weymouth, Framingham, Peabody, Maynard, Lowell, Chelsea and Abington. In addition, PCM members/associates have admitted to obtaining both illegal drugs and illegal firearms from sources in other states, including New Jersey, as well as committing violent crimes in other states.

13.    Based on admissions by PCM members/associates, including GAMA, PCM began approximately two years ago in Massachusetts. PCM members and associates, including GAMA and COSTA, have further admitted that the gang's members and associates deal drugs (including cocaine, cocaine base, heroin, and marijuana) and commit various crimes, including violent crimes such as armed robberies, armed assaults, and kidnappings. Along these lines, as discussed below, GAMA told CW-1 and CW-2 that PCM not only committed robberies in Massachusetts, but that they had also done at least one armed robbery in Connecticut targeting a drug dealer and his family – GAMA told CW-1 and CW-2 that, during the robbery, GAMA held a gun to the head of the dealer's daughter. Investigators have identified numerous social media postings of PCM gang members/associates identifying and boasting about PCM, including flashing gang signs. As one example, COSTA posted an image of the initials "PCM" on the floor of a residence spelled out in $100 bills. Investigators have also seized photos from gang

6

members/associates in which they identify as "PCM," including through graffiti. Other seized photos show PCM members/associates displaying firearms and magazines for firearms loaded with rounds of ammunition. Law enforcement has also seized a baseball bat with "PCM" emblazoned on it.

14.    PCM members/associates have stated that PCM is led by a "Boss" to whom they report. GAMA was recorded on numerous occasions referring to his "Boss," and to acting on behalf of the "Boss." Per the investigation, investigators have identified COSTA as the "Boss" to whom GAMA referred. In fact, as discussed below, COSTA was introduced to an undercover ATF agent as a PCM leader, and was active in the discussion with the undercover agent of a planned armed robbery – this planned robbery was part of a sting operation instituted per the investigation. During this discussion, COSTA repeatedly stated that it was likely that gang members/associates would commit murder in conjunction with the planned armed robbery. COSTA's statement about murder echoed prior recorded meetings with GAMA where he also stated that the PCM gang members would likely commit murder as part of the planned robbery. In addition to openly discussing the gang and its operations, PCM members/associates have committed numerous crimes as part of their membership/association with the gang as set forth below.

**PCM's Ongoing Robbery/Drug Trafficking Conspiracy**

15.    As noted above, the initial stages of the investigation involved CW-1 and CW-2 targeting PCM members/associates through controlled illegal firearms sales. During some of these sales, GAMA was recorded asking the CWs to identify drug dealers for PCM to rob. Based on GAMA's statements, investigators established a sting operation to identify PCM

members/associates involved in armed robberies.  Per instructions from investigators, the CWs told GAMA that they were aware of a disgruntled Mexican drug courier who could provide a target – the disgruntled drug courier was in fact an ATF undercover agent.  GAMA thereafter pushed the CWs to help set-up the robbery.  For example, on January 8, 2019, GAMA left a series of voicemails for CW-1.  During the voice mails, GAMA indicated he and his gang were prepared to do a robbery and were waiting for the CWs to set it up:

> MESSAGE #1 – What's up my friend.
>
> MESSAGE #2 – I have everything set up.
>
> MESSAGE #3 – People that have money, houses … everybody I know will do it, we are all about the crime.
>
> MESSAGE #4 – All right my friend get everything ready and let me know.
>
> MESSAGE #5 – Or just tell me and I will set everything up.
>
> MESSAGE #6 – We have guns, .45s, we always have guns.
>
> MESSAGE #7 – Let me know as soon as possible so we can get the best one.  I can call my gang so we can do the robbery.  Then we can sell the guns to you.  Each person gets a piece of the cake.

Not only did GAMA relate that the gang was prepared to do the robbery to CW-1 and CW-2, other cooperators were informed by PCM members/associates that the gang had a robbery brewing which would result in a large take for the gang.

16.    On March 8, 2019, the undercover agent and the CWs met with GAMA in an undercover vehicle equipped with a recording device.  The undercover also wore a recording device.  During the meeting, the undercover asked GAMA: "You rob motherf***ers?"  GAMA

8

answered affirmatively. The undercover asked GAMA if he robbed drug stash houses. GAMA replied: "Yes." The undercover then claimed that he was a disgruntled cocaine courier working for a Mexican drug trafficking organization ("DTO") that was setting-up operations in the Boston area. The undercover stated that he was responsible for transporting cocaine for the DTO from stash houses, and further stated that every time he collected cocaine at the DTO's stash houses, he observed at least ten (10) "kilos of pure cocaine."

17.    The undercover agent told GAMA that the stash house always had two guards, one of whom was armed with a pistol. GAMA replied, "That's not a problem if this guy has, always has a pistol ... we have to shoot him first, you know? It's easy." The undercover asked GAMA if he had a "crew" to conduct the robbery. GAMA responded, "Yeah ... Of course, we can do it." The undercover asked GAMA how many crew members he would need to conduct the robbery. GAMA explained that it depended on the size of the house, and, if it was a big house, it would require at least four men to conduct the robbery. The undercover also discussed the split of the proceeds of the robbery with GAMA. The undercover guaranteed no less than ten (10) kilograms of cocaine inside the stash house during the robbery, and wanted five (5) kilograms of cocaine for his share of the proceeds. GAMA agreed to split the cocaine obtained during the robbery evenly.

18.    The undercover offered to get GAMA a phone so that GAMA could communicate with the undercover concerning the robbery, and then dump the phone after the robbery. The undercover and GAMA thereafter walked to a mobile phone store. The undercover asked GAMA if he had come to the meeting alone. GAMA stated that his "Boss" was in the nearby diner. The undercover asked GAMA if his "Boss" would also be participating in the robbery, to

which GAMA replied, "No. My Boss just sells drugs." The undercover asked GAMA if he thought the other members his crew would be able to meet early the following morning. GAMA stated that he did not know as he needed to "choose his guys" because "anyone can shoot," however, the proposed robbery was a "hard thing." GAMA stated that he would advise the undercover if a meeting on the following morning would be possible after picking his crew members.

19.     Between the dates of March 14 and March 20, 2019, the undercover and GAMA engaged in text messages and calls to arrange a meeting on March 20. The undercover and GAMA eventually agreed to meet on March 20, at approximately 7:00 p.m., at a hotel in Revere, MA. On March 20, at approximately 7:18 p.m., the undercover placed a recorded phone call to GAMA. GAMA asked if the undercover could meet him at the same location where they had previously met on March 8. The undercover did not agree, and explained to GAMA that it would be better if they could meet at the hotel so that the details of the robbery could be discussed in private. GAMA advised that it would only be him and his "Boss" at the meeting and again asked if the undercover could meet with them at the location of the previous meeting. The undercover explained that it was imperative he meet with all of the members of GAMA's crew to discuss the details of the robbery and for safety purposes. GAMA stated that the undercover would not need to meet with all the members of his crew because only he and his "Boss" had "permission" to "shoot." They eventually agreed to meet at the hotel.

20.     At approximately 8:49 p.m., at the hotel, the undercover activated the electronic recording equipment on his person, as well as electronic recording equipment worn by CW-2. The hotel room used by the undercover also had recording devices placed in it. At

10

approximately 8:52 p.m., the undercover and the CWs (CW-1 and CW-2) exited the front

entrance of the hotel to meet with GAMA and his associates.  The undercover observed GAMA

standing near a four-door, BMW sedan.  The undercover also observed two other males standing

near the BMW sedan.  GAMA opened the door and COSTA exited the vehicle.  After

introductions were made, GAMA suggested that they all go inside.  The undercover agreed and

all parties then returned to the undercover's hotel room.  The four individuals were identified as

COSTA, GAMA, HENRIQUE and MELO.

21.     In the hotel room, GAMA introduced his associates to the undercover and CWs as

the "guys" he trusted with his "life."  During the meeting, COSTA asked the undercover what his

plan was.  The undercover replied: "That's why I'm coming to you guys … You tell me how to

do it."  COSTA asked, "So you mind if we kill those people?"  The undercover responded that he

did not.  COSTA stated: "If they have a gun, we should kill those guys."  HENRIQUE began to

converse with COSTA in Portuguese.  COSTA advised that HENRIQUE was explaining how

they needed to conduct the robbery and added that HENRIQUE stated they should try not to

"kill" the guards, however he (COSTA) thought they "should kill" the guards.

22.     The undercover discussed the split of the proceeds of the robbery with GAMA,

COSTA, HENRIQUE and MELO.  The undercover guaranteed no less than ten (10) kilograms

of cocaine inside the stash house during the robbery.  The undercover wanted five (5) kilograms

of cocaine for his share of the proceeds.  The undercover asked, "You guys cool with that?"

COSTA agreed to the split.  The undercover further stated that the kilos to be stolen were

"stamped" with either a "little horse" or a "scorpion."  The undercover stated that he needed to

know that COSTA and his associates could "get rid" of the kilos so as not to be able to tell that

11

the kilos came from the robbery. GAMA affirmed that it could be done: "That's what we do …
most the time, we cut it in half … or less than …."

23.     When discussing the execution of the armed robbery, GAMA stated that he
thought it would be "better" if he and his crew waited to make entry into the house until after the
undercover was inside of the house for "five (5) minutes," so that the door would be "open."
COSTA instructed the undercover to leave the door "unlocked." COSTA added that they would
"maybe just kill one [of the guards]" and "grab that other guy to show [them] everything."
COSTA also advised that he and his crew would follow the undercover to the stash house and
would leave the undercover behind in the stash house. COSTA suggested that he and his crew
meet with the undercover once more, prior to the robbery, to secure the robbery plan. The
undercover agreed. The undercover asked MELO if he was "good," and COSTA stated that
MELO would do whatever they asked him to do.

24.     The undercover asked COSTA if they all had their "straps" [guns] to which
COSTA replied, "Yeah." The undercover stated that he would also find a location where
COSTA and his crew could bring the undercover's allotment of five (5) kilograms of cocaine,
after they had conducted the robbery. GAMA then stated that they were going to "build a new
cartel in Massachusetts." He stated that they could do so because they were "PCM." GAMA
asked the undercover agent if he knew what PCM was. The undercover replied that he did not.
GAMA responded that PCM stood for "Primeiro Comando da Massachusetts." The undercover
asked if they were "fuertes" (strong) and if they were a "ganga" - "ganga" is commonly used to
refer to a gang. COSTA affirmatively acknowledged by stating that they "move a lot of drugs"
in this area.

## PCM DRUG DEALS

25.     On March 3, 2019, CW-1 received text messages and a video of a Ruger .45 caliber pistol and a Kel-Tec .380 caliber pistol from GAMA attempting to set-up an illegal gun deal.  CW-1 negotiated a price for both pistols, and told GAMA that they could meet at the Stop and Shop in Somerville.  GAMA replied that Somerville was "hot" because a rival gang recently shot at his residence in Somerville – investigators have confirmed that such a shooting did occur at a Somerville residence used by GAMA and COSTA.  GAMA stated that they would meet at the Stop and Shop parking lot in Malden.

26.     On March 4, 2019, CW-1 received a text image of crack cocaine (cocaine base) from GAMA.  They eventually negotiated a price for 45 grams of crack cocaine.  They also agreed to meet at the Stop and Shop parking lot in Malden at 3 p.m.  Prior to the deal, CW-1 and CW-2 met with agents/officers at a prearranged location and were provided with (1) an undercover vehicle equipped with a recording device and (2) money to purchase the drugs and firearms.  CW-1 and CW-2 were thereafter surveilled to the meet location by agents/officers.  CW-1 and CW-2 parked in the Stop and Shop parking lot.  The CWs observed an orange Toyota hatchback park near the undercover vehicle; surveillance established that the vehicle was driven by COSTA.  The CWs observed GAMA exit the Toyota carrying a black box and enter their vehicle.  GAMA removed two handguns and crack cocaine from the box.  The CWs examined the handguns and the crack cocaine, and then paid GAMA.  GAMA bragged about having a major source of supply for firearms in Utah.  The CWs were surveilled back to a prearranged location by agents/officers.  At the location, the CWs provided agents with a substance consistent with cocaine base and the two handguns, which were (1) a Kel-Tec, CNC Industries, model

13

P3AT, .380 caliber semi-automatic pistol (serial number JVU99), loaded with nine rounds of ammunition, and (2) a Ruger, model SR 45, .45 caliber semi-automatic pistol (serial number 380-44557), loaded with seven rounds of ammunition. Based upon a laboratory analysis, the substance is cocaine base and has a weight of approximately 43 grams.

27.    On March 5, 2019, CW-1 received a text from GAMA in which GAMA offered to sell 15 grams of crack cocaine to CW-1.  CW-1 negotiated a price for the drugs and arranged to meet GAMA at the Stop and Shop parking lot in Malden on March 6.  Prior to the deal, CW-1 and CW-2 met with agents/officers at a prearranged location and were provided with (1) an undercover vehicle equipped with a recording device and (2) money to purchase the drugs.  CW-1 and CW-2 were thereafter surveilled to the meet location by agents/officers.  CW-1 and CW-2 parked in the Stop and Shop parking lot.  The CWs observed a blue Honda CRV park near the undercover vehicle.  GAMA exited the front passenger seat and entered the rear passenger seat of the undercover vehicle.  The CWs observed GAMA remove two zip lock bags containing what appeared to be crack cocaine from his jacket pocket.  GAMA handed CW-2 the larger bag and told the CWs that the bag had 15 grams in it.  GAMA asked the CWs if they had a scale to weigh it.  They responded they did not.  CW-2 handed GAMA money for the drugs.  The CWs were surveilled back to a prearranged location by agents/officers.  Based upon a laboratory analysis, the substance is cocaine and has a weight of approximately 13 grams.

28.    On March 15, 2019, CW-3[3] was introduced to COSTA by another cooperator in

---

[3] CW-3 has requested that his/her identity not be revealed for fear of reprisal or harm to his/her physical safety.  I am aware of CW-3's identity and have met with CW-3 personally.  CW-3 has provided accurate, truthful, and reliable information to law enforcement, including the ATF and HIS in the past and continues to do so to the present.  CW-3 has a minor criminal history and no convictions.  CW-3 has received money from the government and has been promised protection

order to purchase MDMA pills (also known as ecstasy). Prior to the deal, the cooperators met with agents/officers at a prearranged location and were provided with (1) an undercover vehicle equipped with a recording device and (2) money to purchase the drugs. The cooperators were thereafter surveilled to the meet location by agents/officers. They drove to 46 Stearns Street in Malden to do the deal – this location is being used by COSTA and GAMA since the gang-related shooting at their residence in Somerville. COSTA exited 46 Stearns Street and entered the rear of the undercover vehicle. During the deal, CW-3 told COSTA that he was interested in purchasing a "31" (31 grams of cocaine). COSTA described his cocaine as "the best." COSTA put a plastic bag containing the thirty-five (35) MDMA pills on the center console. CW-3 provided COSTA with payment for the MDMA pills. The CWs subsequently met with agents at a prearranged location and provided the pills sold to CW-3 by COSTA.

29.    On March 18, 2019, CW-3 (while purchasing a handgun from COSTA) arranged to purchase 62 grams of crack cocaine from COSTA on March 19. On March 19, CW-3 exchanged calls and text messages with COSTA. COSTA informed the CW that he had approximately 60 grams of crack cocaine and they agreed on a price. Prior to the deal, CW-3 met with agents and was provided with (1) an undercover vehicle and (2) money for the purchase of cocaine base. CW-3 parked his undercover vehicle (which was equipped with a recording device) across the street from the front entrance to 46 Stearns Street in Malden. COSTA exited the front door of 46 Stearns Street, and entered the front passenger seat of the undercover vehicle. COSTA removed a large bag of what appeared to be crack cocaine from his jacket pocket along with a digital scale. The CW handed COSTA money for the drugs and instructed

---

against retaliation, including possible relocation, upon disclosure of CW-3's cooperation with law enforcement. CW-3 is also seeking immigration assistance to remain in the United States.

him to count the money.  The CW weighed the bag of crack cocaine. COSTA told the CW if he

needed more crack cocaine he could get more next week from New Jersey.  The CW was

surveilled back to a prearranged location by agents/officers and provided them with a substance

consistent with cocaine base.

### Robberies Committed by PCM Members/Associates

#### October 18, 2018 – Boston Robbery

30.     On October 18, 2018, two individuals (who were attempting to conceal their

faces) attempted to rob a market in Boston.  One of the individuals displayed what appeared to

be a silver and black gun during the robbery attempt.  The attempted robbery failed and the

individuals fled the scene.  Fingerprint evidence identified GONCALVES as one of the

individuals.  In addition, investigators have reviewed security footage from the market and

identified that one of the individuals who attempted to commit the robbery appears to be

GONCALVES.

#### December 9, 2018 – Everett Robbery

31.     On December 9, 2018, in Everett, a Dominos delivery person reported that he had

been robbed at gunpoint by two males, whom the delivery person could not describe fully.  The

delivery person did note that he believed that one of the robbers was speaking Portuguese (PCM

members and associates are predominately Brazilian nationals and thus speak Portuguese).

Approximately $800 in cash and the delivery person's phone were stolen.  The next day, the

delivery person contacted the police and stated that he had tracked his phone to a yard in Everett.

An officer responded and identified that the phone was in a flower bed in a manner consistent

with being thrown over a nearby fence.  The phone was recovered for evidence.  A fingerprint

analysis performed by the Massachusetts State Police identified a finger print on the phone that matches DASILVA's prints.

### January 10, 2019 – Everett Robbery

32.     On January 10, 2019, two men were robbed at gunpoint outside a business in Everett. The two victims were herded into the back seat of a vehicle by four individuals. The victims have identified GAMA and DASILVA as two of the individuals involved. Both victims told law enforcement that three men in the vehicle displayed what appeared to be firearms during the robbery. The robbers stole personal jewelry and a small amount of money from the two victims.

### January 14, 2019– Framingham Robbery

33.     On January 14, 2019, in Framingham, two employees of Annie's One Stop Laundry were robbed at gunpoint. The victims were contacted by an alleged customer (subsequently identified as GONCALVES), and asked to stay late in order for GONCALVES to allegedly pick-up a cell phone – the business sells and repairs cellular phones. The victims met with GONCALVES in the parking lot of the business. The victims were told to get into a white Nissan by GONCALVES, who was accompanied by three other males. The two victims were forced into the back seat of the vehicle and blocked from access to either rear door. Once in the vehicle, at least two robbers pointed what appeared to be firearms at the victims and demanded any valuables that the victims had. A victim was able to identify one of the four robbers as I. COSTA based on past experience with I. COSTA. The two victims were also able to identify that the Nissan was I. COSTA's vehicle – this vehicle has been associated with other PCM robberies. The victims were also able to subsequently identify the other individuals through means of social

media.  The victims identified GONCALVES, DASILVA, and HENRIQUE as the individuals

that robbed them at gunpoint.  The victims stated that DASILVA and HENRIQUE possessed

firearms during the robbery with DASILVA possessing a revolver – as discussed below, a

revolver was used by DASILVA in a later armed kidnapping.

<u>January 16, 2019– Stoughton Robbery</u>

34.     On January 16, 2019, a home invasion robbery was conducted at an apartment in

Stoughton, MA, involving three male victims.  Two of the victims were the robbery victims

targeted on January 10 in Everett by PCM members/associates as discussed above.  The third

victims stated that, as he and his two friends returned to an apartment in Stoughton, they

observed a white Nissan parked in the driveway of the multi-family house – this vehicle has been

identified as I. COSTA's car and was the same vehicle used in the January 14 robbery as

discussed above.   One of the victims recognized I. COSTA as one of two people seated in the

car.   As the three victims opened the door to the apartment, they were surprised by three men

standing inside the apartment.   The victims identified two of the men as DASILVA and

HENRIQUE.  Per the victims, DASILVA was armed with a revolver and pointed it at the three

victims.   The third individual did the talking and made each man lift their shirts to show they

were unarmed.  The third individual ordered one of the victims to pay DASILVA $100.  The

victim paid the money and eventually the three robbers left.

<u>January 17, 2019 – Weymouth Robbery</u>

35.     On January 17, 2019, three males robbed a Weymouth Mobil gas station at gun

point and stole cash, cigarettes, and other items.  During the robbery, the gas station attendant

was struck with a revolver and injured.  After the robbery, as the assailants made their escape,

18

one of robbers shot himself, or was shot by his co-conspirator, as the victim heard a gunshot, and responding officers recovered a bloody sandal. A short time later, Weymouth detectives were contacted by Boston Police officers when a juvenile arrived at a Boston hospital seeking treatment for a gunshot wound. The juvenile was brought to the hospital by I. COSTA. BPD officers seized I. COSTA's clothes which had blood on them – they also matched the type of clothes as one of the assailants per surveillance camera footage. Inside the juvenile's jacket was an identification card bearing the name Edson DASILVA. Following the Weymouth robbery, HENRIQUE admitted to CW-4 that HENRIQUE had intended to do the gas station robbery with DASILVA and the others, and had cased the gas station in preparation for the robbery, but had not been able to go the day of the robbery.

### January 23, 2019 – Marlborough Robbery

36.     On January 23, 2019, in Marlborough, a victim and his girlfriend arranged to meet with MELO at a restaurant parking lot regarding a car that the victim had bought from MELO – the car had stayed registered in MELO's name. Based on reports from the victims, MELO arrived in I. COSTA's Nissan, and the Nissan blocked the victims' vehicle. Four males got out of the vehicle, including MELO and GONCALVES as identified by the victims. The males yelled at the two victims to get out of their car, and GONCALVES pointed what appeared to be a silver and black firearm at them. The victims left their car. The robbers took the car, along with property in the car. Later that day, GONCALVES was arrested with I. COSTA in I. COSTA's Nissan in Revere. A silver and black pellet gun was recovered from the Nissan.

19

## February 7, 2019 – Peabody/Revere/Maynard Armed Kidnapping

37.    On February 7, 2019, DASILVA and HENRIQUE were involved in the kidnapping of a juvenile female victim, who they believed could help them target a rival gang member for violence. The victim was lured out of a residence in Peabody by HENRIQUE and DASILVA, then taken to a residence in Revere used by the PCM gang, before eventually being taken to a residence in Maynard, MA, where she was held at gunpoint and threatened by DASILVA. CW-4 was present during the kidnapping and alerted the ATF once CW-4 was able to do so safely.[4] CW-4 informed agents that DASILVA and HENRIQUE were involved in the kidnapping and that DASILVA had a revolver which he pointed at the victim during the kidnapping. The victim also implicated DASILVA as kidnapping her and that DASILVA pointed a revolver at her on more than one occasion during the kidnapping. A third witness provided police with a statement identifying both DASILVA and HENRIQUE as being involved. The third witness also informed officers that when HENRIQUE left the Maynard residence with the witness, before police arrived, HENRIQUE expressed regret as to their actions with the victim. The third witness also briefly saw a handgun on the floor of the vehicle used in the kidnapping.

38.    Maynard Police officers established surveillance at the location where the kidnapping victim was being held. Police apprehended a juvenile male exiting the location. This juvenile male was found to be in possession of a Smith & Wesson, model 36, .38 caliber

---

[4] CW-4 has requested that his/her identity not be revealed for fear of reprisal or harm to his/her physical safety. I am aware of CW-4's identity. Agents have also met with CW-4 in person. CW-4 lacks immigration status and is in removal proceedings, with no order of removal entered. CW-4 has received monetary benefits.

revolver (serial number 375597). The firearm was unloaded – rounds for the revolver were subsequently recovered from the Maynard residence. A police tactical team eventually gained entry to a second floor apartment at the Maynard residence, and found DASILVA and the victim in a bedroom. DASILVA was arrested. DASILVA was interviewed, after receiving *Miranda* warnings, and confessed to possessing the firearm that was recovered from the male juvenile. DASILVA also admitted that he was present in Peabody earlier in the day. He did not admit to the kidnapping.

39.     Based on the foregoing, there is probable cause to believe that each of the defendants agreed with each other and others known and unknown that a conspirator would conduct or participate in the conduct of the affairs of the PCM association-in-fact enterprise by engaging in two or more acts of racketeering as required by 18 U.S.C. § 1962(d). Therefore, there is probable cause to believe that all of the defendants have conspired to violate 18 U.S.C. § 1962(c) in violation of 18 U.S.C. § 1962(d).

### PCM ILLEGAL FIREARMS SALES

40.     On November 28, 2018, CW-1 and CW-2 made a controlled purchase of a handgun from GAMA and COSTA in Malden. Prior to the controlled purchase, ATF agents met with and searched the CWs for contraband with negative results. Agents equipped the CWs with a vehicle containing a recording device which recorded in both audio and video; the device worked properly and recorded the transaction with GAMA. Surveillance personnel were assigned to the area of the Stop and Shop parking lot in Malden. The CWs were under constant surveillance by agents/officers during the operation. GAMA and COSTA arrived at the parking lot in a rental vehicle. GAMA entered the undercover vehicle. CW-1 purchased a handgun and

21

ammunition from GAMA. The CWs left the area, and were kept under surveillance as they proceeded to a prearranged meeting site. A Malden Police Department marked vehicle stopped GAMA and COSTA for a traffic violation shortly after they left the parking lot. COSTA provided the uniformed officer with a valid Massachusetts driver's license. GAMA provided a false name. At the meeting site, the CWs provided agents with a Smith & Wesson, model 38 Airweight, .38 caliber revolver (serial number J503213), and three rounds of ammunition.

41.     On December 14, 2018, CW-1 and CW-2 made a controlled purchase of a handgun from GAMA in Somerville. Prior to the controlled purchase, ATF agents met with and searched the CWs for contraband with negative results. Agents equipped the CWs with a vehicle containing a recording device which recorded in both audio and video; the device worked properly and recorded the transaction with GAMA. Surveillance personnel were assigned to the area of the Stop and Shop parking lot in Somerville. The CWs were under constant surveillance by agents/officers during the operation. GAMA and another male (the driver) arrived at the parking lot in a red Honda Civic. GAMA entered the undercover vehicle. CW-2 purchased a handgun from GAMA. During the buy, GAMA told the CWs that he was a founding member of PCM. The CWs left the area, and were kept under surveillance as they proceeded to a prearranged meeting site. At the meeting site, the CWs provided agents with a Davis Industries, model P-380, .380 caliber pistol with an obliterated serial number. Based upon a review of the seized firearm by the ATF, the firearm possessed by GAMA (who is an alien illegally present in the United States) was manufactured outside of Massachusetts, and, therefore, traveled in interstate or foreign commerce.

42.     On December 28, 2018, CW-1 and CW-2 made a controlled purchase of a handgun

22

from GAMA in Somerville. Prior to the controlled purchase, ATF agents met with and searched the CWs for contraband with negative results. Agents equipped the CWs with a vehicle containing a recording device which recorded in both audio and video; the device worked properly and recorded the transaction with GAMA. Surveillance personnel were assigned to the area of the Stop and Shop parking lot in Somerville. The CWs were under constant surveillance by agents/officers during the operation. Surveillance personnel observed GAMA arrive on foot from an entrance at the rear of the parking lot. GAMA entered the undercover vehicle. CW-2 purchased a handgun from GAMA. During the buy, GAMA asked the CWs to set up a drug robbery for his gang to commit. The CWs left the area, and were kept under surveillance as they proceeded to a prearranged meeting site. At the meeting site, the CWs provided agents with a Bersa, Thunder 9 Ultra Compact Pro, 9mm pistol (serial number 999407). Based upon a review of the seized firearm by the ATF, the firearm possessed by GAMA (who is an alien illegally present in the United States) was manufactured outside of Massachusetts, and, therefore, traveled in interstate or foreign commerce.

43.    On January 16, 2019, CW-1 and CW-2 made a controlled purchase of a handgun and ammunition from GAMA in Somerville. Prior to the controlled purchase, ATF agents met with and searched the CWs for contraband with negative results. Agents equipped the CWs with a vehicle containing a recording device which recorded in both audio and video; the device worked properly and recorded the transaction with GAMA. Surveillance personnel were assigned to the area of the Stop and Shop parking lot in Somerville. GAMA entered the undercover vehicle. CW-2 purchased a handgun and ammunition from GAMA. During the buy, GAMA continued to pressure the CWs to set up a drug robbery for his gang to commit. GAMA bragged

23

that he had ten gang members, including one member who was wanted for murder in Brazil, prepared to commit the robbery. GAMA also talked about a drug robbery that he recently committed in Connecticut with his gang. GAMA told the CWs that he and his gang associates had robbed a drug dealer, and that GAMA had held the drug dealer's daughter at gunpoint during the robbery by putting a gun to her head. At the meeting site, the CWs provided agents with a Llama, Especial, .22LR caliber pistol (serial number 35417), and five rounds of .22LR caliber ammunition. Based upon a review of the seized firearm by the ATF, the firearm possessed by GAMA (who is an alien illegally present in the United States) was manufactured outside of Massachusetts, and, therefore, traveled in interstate or foreign commerce.

44.     On January 23, 2019, CW-1 and CW-2 made a controlled purchase of a 12 gauge sawed-off shotgun and ammunition from GAMA in Somerville. Prior to the controlled purchase, ATF agents met with and searched the CWs for contraband with negative results. Agents equipped the CWs with a vehicle containing a recording device which recorded in both audio and video; the device worked properly and recorded the transaction with GAMA. GAMA met the CW's at the same Somerville parking lot as prior deals. GAMA arrived at the lot in a black Honda Civic. Surveillance personnel observed several unidentified persons in the black Honda Civic. GAMA entered the undercover vehicle. CW-2 purchased a sawed-off shotgun and ammunition from GAMA. GAMA told the CWs that he and his associates in the car were delivering drugs and were armed. The CWs attempted to meet with GAMA's associates, but GAMA told them that his "Boss" was very careful and did not want to meet people. At the meeting site, the CWs provided agents with a High Standard Arms, model 20, 12 gauge, pump action, sawed-off shotgun (overall length of 24 ½ inches and a barrel length of 13 7/8 inches),

24

manufactured with no serial number, and three rounds of ammunition. Based upon a review of the seized firearm by the ATF, the firearm possessed by GAMA (who is an alien illegally present in the United States) was manufactured outside of Massachusetts, and, therefore, traveled in interstate or foreign commerce.

45.     On February 12, 2019, CW-1 and CW-2 made a controlled purchase of a handgun and approximately 31 grams of cocaine from GAMA in Somerville. Prior to the controlled purchase, agents met with and searched the CWs for contraband with negative results. Agents equipped the CWs with a vehicle containing a recording device which recorded in both audio and video; the device worked properly and recorded the transaction with GAMA. Agents then provided CW-2 with official government funds in order to purchase the handgun and cocaine. Surveillance personnel were assigned to the area of the Stop and Shop parking lot in Somerville. GAMA entered the undercover vehicle. CW-2 purchased a handgun and cocaine from GAMA. GAMA bragged about a burglary he and his gang recently committed. GAMA told the CWs he and his gang were ready to do anything for money, including "kill." GAMA bragged that his gang killed a person for $4,000. At the meeting site, the CWs provided agents with a Colt, 1911 US Army, .45 caliber pistol (serial number 248589), and approximately 31 grams of what appeared to be cocaine. Based upon a review of the seized firearm, the firearm possessed by GAMA (who is an alien illegally present in the United States) was manufactured outside of Massachusetts, and, therefore, traveled in interstate or foreign commerce.

46.     On March 13, 2019, GAMA sent a text picture of a Remington, .380 caliber pistol and three loaded magazines to CW-1. CW-1 negotiated a deal for the gun and ammunition. They agreed to meet on March 14 at the Stop and Shop parking lot in Malden. On March 14,

GAMA sent a text that he could not meet the CWs. Later that evening, GAMA sent a text picture of a .380 caliber pistol to CW-1. The CW negotiated a price for the gun. They agreed to meet on March 15 at the Stop and Shop parking lot in Malden. Prior to the controlled purchase, ATF agents met with and searched the CWs for contraband with negative results. Agents equipped the CWs with a vehicle containing a recording device which recorded in both audio and video; the device worked properly and recorded the transaction with GAMA. On March 15, 2019, CW-1 and CW-2 observed a dark colored BMW sedan leave a parking spot in the main parking lot and drive directly to the undercover vehicle. The CWs observed COSTA (driver) and GAMA (passenger) in the BMW. GAMA entered the rear of the undercover vehicle. GAMA removed a black handgun from his jacket pocket and handed it to CW-2, who examined the handgun and then paid GAMA for the gun. The CWs observed GAMA return to the BMW sedan and leave the parking lot with COSTA. Following the deal, the CWs provided agents with a Smith & Wesson, Bodyguard, .380 caliber pistol (serial number EAM0413).

47. On March 17, 2019, COSTA sent a text picture of a .32 caliber pistol to CW-3. The CW negotiated a price for the gun. The CW and COSTA arranged to meet at COSTA's residence on Stearns Street in Malden. Prior to the controlled purchase, ATF agents met with and searched the CW for contraband with negative results. Agents equipped the CW with a vehicle containing a recording device which recorded in both audio and video; the device worked properly and recorded the transaction with COSTA. On March 18, the CW drove directly to Stearns Street and parked the undercover vehicle across the street from 46 Stearns Street. COSTA exited the front door of 46 Stearns Street carrying a white plastic shopping bag and entered the undercover vehicle. The CW examined the handgun (a .32 caliber Mauser pistol,

26

bearing serial number 865754) in the bag and paid COSTA for the gun. The CW told COSTA he preferred new guns and asked COSTA if he could get him/her a new Glock pistol. COSTA indicated he could. COSTA told the CW the 62 grams of crack cocaine he ordered for the CI would arrive that night from New Jersey.

48.    On April 13, 2019, COSTA contacted CW-3 regarding the purchase of a firearm and multiple magazines. The CW negotiated a price for the gun. The CW and COSTA arranged to meet in Chelsea to do the deal. Prior to the controlled purchase, ATF agents met with and searched the CW for contraband with negative results. Agents equipped the CW with a vehicle containing a recording device which recorded in both audio and video; the device worked properly and recorded the transaction with COSTA. On March 18, the CW drove directly to Addison Street in Chelsea. COSTA entered the undercover vehicle and provided the CW with a handgun and multiple magazines for the handgun. The CW examined the handgun and paid COSTA for the gun. The CW thereafter met with agents at a prearranged location and provided the agents with a Springfield Armory, XDS, 9mm pistol (serial number XS930548) and multiple magazines for the handgun.

49.    Based on a review of ATF records, neither GAMA nor COSTA has a federal firearms license which allows them to sell firearms.

## CONCLUSION

50.    Based on the information described above, I have probable cause to believe that the defendants as identified above have committed federal crimes as identified above.  In light of the violent crimes committed by the defendants, as well as their association with firearms, I further request that agents/officers be allowed to execute any arrest or search warrants without knocking and announcing as such actions would potentially place executing agents/officers in danger.

Sworn to under the pains and penalties of perjury,

PETER MILLIGAN
Special Agent
Bureau of Alcohol, Tobacco, Firearms and
Explosives

Subscribed and sworn to before me on 4/24/19

HONORABLE M. PAGE KELLEY
United States Magistrate Judge